UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07CR 61 JCH |
| | ) | |
| ADAM EDMOND O'LEARY, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

### Factual Background

On March 11, 2007, at approximately 3:19 A.M., Fredericktown Police Officer Henry Adams observed a white Ford Crown Victoria, police interceptor model, drive into the Wal-Mart parking lot. Adams noted that it had Arkansas license plates and that the driver "seemed kind of nervous and kind of took a double look" at him prior to running into the Wal-Mart store. Adams felt that was unusual because he did not feel that a reasonable person would do a double take and "look nervous" at a police officer. Adams noted that the driver was a white female wearing a camouflage jacket and pants.

Adams picked up off duty Officer Simmons who was working at the Wal-Mart and discussed the situation with him. Adams then drove by the rear of the Ford Crown Victoria and looked at the rear license plate and requested a computerized license check on the vehicle. The plate came back registered to an "abandoned derelict vehicle out of St. Charles, Missouri," which was a Chevy utility vehicle and the registration had expired in 2005.

Adams testified tht he believed that it was an offense to display the wrong plates on a vehicle and a separate offense to drive a vehicle where the plates had expired two years earlier. Adams testified further that given his training and experience, he knew that such circumstances may be indicative of possibly a stolen vehicle or of a vehicle that may have been used in another crime. Adams and Simmons had left the Wal-Mart lot after requesting the plate information and returned some three to five minutes later after getting the results. Upon arrival, they noted that the Arkansas license plate had been removed from the rear of the vehicle. Adams's concern was heightened because he felt that the "car was probably stolen or the vehicle was abandoned."

Adams then began to attempt contact with the occupants of the vehicle, and Officer Simmons went back to work in Wal-Mart. Simmons had agreed to call Adams if he saw the person whom Adams had described to him as the driver leave the store. Adams then requested assistance from County deputies, given the circumstance that the Wal-Mart store was outside the city limits.

Officer Simmons called Adams to tell him that the driver and a male subject with a red shirt were leaving the store. Adams waited at the Ford Crown Victoria; however, no one arrived at the car. Adams then learned from another Wal-Mart employee that "the female in the camouflage was in the back seat of a GMC Sonoma and was crouched down and that a male subject in a red shirt was crouched down in the passenger seat of the Sonoma."

Adams thought that behavior was highly suspicious and determined that he needed to "find out what was going on." At that point, Adams requested deputies to make a vehicle

stop on the GMC Sonoma. Adams then looked in through the windshield and checked the VIN on the Ford which, like the Arkansas license plate, came back registered to an "abandoned derelict vehicle out of St. Charles, Missouri." Adams testified that he then used his police flashlight to look into the passenger compartment and observed what he believed to be, based on his training and experience, crystal methamphetamine lying on the floorboard of the vehicle.

Adams then went out to meet the County deputies where they had stopped the GMC and met with the girl in camouflage whom he recognized as the driver of the Crown Victoria. The driver denied driving the Ford and said that she did not know anything about it, which Adams thought was very unusual. Adams then spoke to the large male subject in the red shirt, whom he later learned was the defendant, Adam O'Leary. O'Leary told Adams that he had not been in the Crown Victoria and he did not own one. Adams noted that O'Leary seemed "kind of nervous, very jittery" and appeared to have what are referred to as "meth sores." Adams indicated that he has seen people who are habitual methamphetamine users more than fifty times as a police officer and that O'Leary's appearance, actions and way of talking was consistent with other people that he had seen using methamphetamine. O'Leary told Adams that his name was "Wiezner."

Officer Simmons, who had been watching the Ford Crown Victoria back at Wal-Mart was relieved by Deputy Jesse Eck. Deputy Eck had called Adams by cellular telephone while Adams was still at the scene of the traffic stop of the GMC and relayed that Eck had observed what he believed to be "crystal methamphetamine and also marijuana paraphernalia

within sight of the center console" of the Ford. Adams then returned to Wal-Mart with O'Leary and the female driver who were being detained. Adams also requested that a tow truck come to that location and open the vehicle. Adams had placed O'Leary under arrest and read him his <u>Miranda</u> rights. O'Leary indicated that he understood his rights and agreed to speak with the officers, making some incriminating statements.

A search of the passenger compartment located a package in the console that Adams also believed contained methamphetamine, because it appeared to be the same substance which Adams and Eck had seen on the floorboard of the Crown Victoria. Officer Simmons, who had reviewed the security tapes from the Wal-Mart video cameras, advised Adams that he (Simmons) could see the man in the red shirt take the license plate off the back of the vehicle and put it in the trunk. Because of that, Adams then went to the trunk, opened it and observed the license plate and then located a glass container which Adams believed to contain crystal methamphetamine. After locating that item, Adams inquired of O'Leary, who admitted that the contents of the glass was crystal methamphetamine. O'Leary maintained that the package in the passenger compartment was a cutting agent, which is a substance of similar appearance to methamphetamine which is used to dilute the drug for distribution. At no point that evening did O'Leary attempt to revoke his consent to speak to Adams or request a lawyer. The drug paraphernalia and the package containing suspected methamphetamine were seized but the substance believed to be methamphetamine on the floorboard was not, as Adams did not feel that he needed to do so to make his case. The car was impounded and removed because it had no registration and had displayed the wrong plates.

The following day, March 12, 2007, O'Leary was again interviewed by Adams and DEA Special Agent Darrell Spain. O'Leary was again read his rights by Agent Spain and indicated that he understood those rights and would speak with the officers. Spain testified that O'Leary did not appear to be injured or in distress and appeared to be alert and to comprehend what was going on. No force or threats were made to O'Leary to induce him to talk and O'Leary never complained that he had been mistreated or threatened. O'Leary made statements to the effect that the methamphetamine located in the car belonged to him for his personal use and that he had purchased it approximately one month before. O'Leary requested and was allowed to use the bathroom, shortly after which time he requested to speak with an attorney. Questioning ceased immediately after O'Leary's request for an attorney and no additional statements were made by him.

**Discussion**

An investigative stop is permitted under the Fourth Amendment when a law enforcement officer is able to point to specific and articulable facts which, taken with rational inferences from those facts, create a reasonable suspicion that the person has or is about to commit a crime. United States v. Hughes, 15 F.3d 798 (8th Cir. 1994), citing Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); United States v. Thompkins, 998 F.2d 629, 633 (8th Cir. 1993).

Officer Adams certainly had reasonable suspicion that criminal activity had occurred. He noticed first that a Ford Crown Victoria police interceptor model with Arkansas plates

pulled into the Wal-Mart parking lot at 3:30 in the morning. He noticed that the driver "seemed kind of nervous and kind of took a double look" at him and then ran into the Wal-Mart store. The driver was a female and was wearing camouflage clothing. Adams called in the plates on the Ford and the license plates came back as having expired two years earlier but had been issued for a Chevrolet utility vehicle registered to an "abandoned derelict vehicle out of St. Charles, Missouri." Already there were two traffic violations. The Ford had the license plates from another vehicle and they were expired. Officer Adams thought that the vehicle might have been stolen or might have been used in another crime. An off-duty police officer named Simmons was working at the Wal-Mart store and Officer Adams discussed the matter with Simmons. They went back to the parking lot and saw that the Arkansas license plate had been removed from the rear of the vehicle. Adams asked Simmons to call him if he saw the driver, previously described by Adams to Simmons, leave the store. Simmons went back to work but then called Adams and told him that the driver and a male with a red shirt were leaving the store. Adams went to the Ford Crown Victoria, but the driver and her companion did not show up. Another Wal-Mart employee reported to Adams that "the female in the camouflage was in the back seat of a GMC Sonoma and was crouched down and that a male subject in a red shirt was crouched down in the passenger seat of the Sonoma." Adams thought that was strange. It was strange also that the pair would come in one car, remove the license plate from that car and leave in another vehicle. Fredericktown Police Officer Adams requested Madison County deputy sheriffs to stop the Sonoma vehicle since the Wal-Mart store was outside the city limits and was in the county.

Because of the circumstances recited, Officer Adams had articulable reasons for suspicion, in fact, knowledge that criminal activity was going on or had gone on, at the very least because of the traffic violations.

Officer Adams then looked into the Ford Crown Victoria and checked the VIN, requested its registration and the report came back that it was an "abandoned derelict vehicle out of St. Charles, Missouri." Adams again used his flashlight to check the passenger compartment and observed what he believed to be, based on his training and experience, crystal methamphetamine lying on the floorboard of the Crown Victoria.

Adams went to where the county deputies had stopped the GMC Sonoma and talked to the woman who had driven the Crown Victoria. She denied driving the Crown Victoria and said she did not know anything about it. He then spoke with the defendant, who seemed "kind of nervous, very jittery." Adams noticed what he described as "meth sores" on Mr. O'Leary's face. Adams testified at the hearing that he has seen people who are habitual methamphetamine users more than fifty times as a police officer and that the defendant's appearance and way of talking were consistent with persons he had seen using methamphetamine. The defendant told Officer Adams that his name was "Wiezner."

Madison County Deputy Eck had gone to the Wal-Mart parking lot to where the Crown Victoria was parked, and he said he saw what he believed to be "crystal methamphetamine and also marijuana paraphernalia within sight of the center console." Eck had been involved with over 100 methamphetamine investigations. This was information Eck relayed to Officer Adams, who was still at the stop of the GMC Sonoma. Adams then

brought the female driver of the Crown Victoria and the defendant back to the Wal-Mart parking lot. The defendant had been placed under arrest and had been read his Miranda rights. According to the testimony of Officer Adams, the defendant had indicated that he understood his rights and he agreed to speak with the officers. Adams had requested that a tow truck come to the Wal-Mart parking lot to open the vehicle. A search of the passenger compartment turned up a package within the console which appeared to be methamphetamine and had the same appearance as what had been scattered on the floorboard of the Crown Victoria. In the meantime, Officer Simmons had seen the security tapes from the Wal-Mart video cameras and told Adams that the tapes showed the defendant taking the license plate off the back of the Crown Victoria and putting it in the trunk. Adams went to the trunk, opened it and saw the license plate and also a glass container, which the officer believed held crystal methamphetamine. Mr. O'Leary admitted that what was in the glass container was crystal methamphetamine. He told Officer Adams that what was in the console was a cutting agent which would be mixed with the methamphetamine. The apparent drug paraphernalia and the methamphetamine and cutting agent were seized.

Once the officers saw what they reasonably believed was crystal methamphetamine, they had probable cause to arrest Mr. O'Leary as well as having probable cause to search the Crown Victoria. United States v. Chauncey, 420 F.3d 864, 871 (8th Cir. 2005 cert. denied) (strong odor of marijuana emanating from inside a vehicle sufficient for arrest); United States v. Clayborn, 339 F.3d 700, 702 (8th Cir. 2003) (smell of marijuana provided probable cause to search vehicle); United States v. Peltier, 217 F.3d 608, 610 (8th Cir. 2000) (same). In such

circumstances, the officers may search the entire automobile, including the trunk area, and any items or containers found in the automobile. United States v. Ross, 456 U.S. 798, 823-825, 102 S.Ct. 2157 (1982).

The defendant and his companion were arrested before the automobile was searched, which made the Crown Victoria subject to a search incident to arrest. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034 (1969); United States v. Richardson, 121 F.3d 1051, 1056 (7th Cir. 1997) (search of passenger compartment justified as incident to valid arrest even though arrestee handcuffed and in squad car because passenger compartment was previously within his reach); United States v. Wesley, 293 F.3d 541, 549 (D.C. Cir. 2002) (search of car ashtray valid as incident to arrest after defendant handcuffed and placed in police car). See also United States v. Searcy, 181 F.3d 975, 979 (8th Cir. 1999) (the classic statement of the doctrine is contained in New York v. Belton, 453 U.S. 454, 462 (1981), noting that when police make a valid arrest of the occupant of a vehicle, they may search the compartment and any containers in it, even after they have exclusive control of the vehicle). See also United States v. Williams, 165 F.3d 1193, 1195 (8th Cir. 1995); Curd v. City of Judsonia, 141 F.3d 839, 842 (8th Cir. 1998) (search of the defendant's purse at the stationhouse was valid as incident to arrest even though suspect was arrested at home, search occurred fifteen minutes later and police had exclusive custody of the purse).

Another reason for the validity of the search is that the Crown Victoria was abandoned. The driver in camouflage said she didn't know anything about the Crown Victoria. She had not been driving the Crown Victoria. O'Leary told Adams he had not

been in a Crown Victoria, he did not own a Crown Victoria, a friend had dropped him off at Wal-Mart. (Tr. 60-61). The true nature of that automobile was described on the records of the Department of Revenue as "a derelict." Abel v. United States, 362 U.S. 217, 241 (1960) ("There can be nothing unlawful in the Government's appropriation of ... abandoned property.")

Finally, the contents of the Crown Victoria would have been subject to an inventory search since it had been abandoned, and the contents in turn would have been subject to inevitable discovery. United States v. Pittman, 411 F.3d 813, 817 (7th Cir. 2005) (valid inventory search after driver and passenger fled on foot); United States v. Hurst, 228 F.3d 751, 758 (6th Cir. 2000) (valid inventory search of vehicle after driver fled on foot).

The Court finds the arrest of the defendant, the search of the Crown Victoria and the seizure of the evidence were valid and according to law.

## The Defendant's Statements

The defendant asks in his Motion to Suppress Evidence and Statements that any oral or written statements which were made by the defendant be suppressed because they were involuntary, were elicited by coercion and/or were elicited without defendant being fully advised of and afforded his rights under the Fifth Amendment of the United States Constitution. Therefore, defendant urges said statements are involuntary and inadmissible. The defendant offered no evidence to support his allegations; however, the burden is upon the government if it wishes to offer statements made by a defendant at trial, to show that the statements were made in accordance with the defendant's constitutional rights and were

voluntary.

Officer Adams testified that after the defendant was arrested, Adams read Mr. O'Leary his Miranda rights. Officer Adams testified that he read Mr. O'Leary his Miranda rights from a card. After he read the card, Adams asked O'Leary if he understood his rights and O'Leary said yes. Adams asked, with those rights in mind, would O'Leary like to speak with him, to which O'Leary said yes. At the hearing, Officer Adams read into the record the Miranda warnings which he gave to the defendant.

Officer Adams testified that when Mr. O'Leary was being interviewed on the early morning of March 11, 2007, in the Wal-Mart parking lot, O'Leary at no time asked for a lawyer. He did not ever say he did not want to talk to Adams any more.

The following day, March 12, 2007, O'Leary was again interviewed by Adams and DEA Special Agent Darrell Spain. He was again read his rights by Agent Spain and indicated that he understood those rights and would speak with the officers. The interview took place at the Madison County Sheriff's Department in a breakroom, which had a coffee pot, tables and chairs. Mr. O'Leary was not handcuffed or shackled. Agent Spain testified defendant did not appear to be injured or in any distress. He gave no appearance that anyone had mistreated him. He appeared to be alert and oriented.

Agent Spain explained who he was and why he was there. He advised the defendant of his Miranda rights from a printed card. The defendant indicated he understood the rights after Agent Spain asked if he understood each of the rights. When asked if he would be willing to speak with Agent Spain and Officer Adams, Mr. O'Leary stated he would.

-11-

Mr. O'Leary was permitted to use the bathroom during the interview. After he came back from using the bathroom, according to Agent Spain, almost immediately he stated that he decided he should speak to an attorney to get some advice before he continued to answer any questions. The interview was terminated at that time.

Agent Spain testified that prior to his request for an attorney, O'Leary did not ever indicate to the officers that he did not want to answer questions or that he wanted an attorney. After he came back from using the bathroom and decided he wanted to talk to an attorney was the first time he asked for an attorney.

The testimony was that Mr. O'Leary was not forced or threatened to talk to the officers. He did not complain of being mistreated or complain of being threatened.

A person arrested may make a voluntary and intelligent waiver of his constitutional rights and give a statement that is admissible against him in court. Miranda v. Arizona, 384 U.S. 439 (1966). The court must look at the totality of the circumstances in determining the voluntariness of a statement. Arizona v. Fulminante, 499 U.S. 279 (1991).

In United States v. Mears, 614 F.2d 1175, 1178 (8th Cir. 1980), the Eighth Circuit Court of Appeals quoted from United States v. Zamarripa, 544 F.2d 978, 981 (8th Cir. 1976, cert. denied):

> A voluntary waiver need not assume any particular form; it may be made in writing on a printed format or it may be made orally by replying to questions as in this case. United States v. Johnson, supra (529 F.2d 581) at 584; see Moore v. Wolff, 495 F.2d 35, 37 (8th Cir. 1974). A valid waiver of rights does not require an express declaration to that effect, Hughes v. Swenson, 452 F.2d 866, 867-68 (8th Cir. 1971); nor does lack of such a declaration necessarily indicate a defendant's desire to remain silent, United States v. Speaks, supra (453 F.2d 966) at 969. The validity of a waiver is to be determined from all of the surrounding circumstances. United States v. Marchildon, 519 F.2d 337, 343 (8th Cir. 1975).

In United States v. Meirovitz, 918 F.2d 1376 (8th Cir. 1990), cert. denied, (1991), the Court of Appeals for the Eighth Circuit set out the appropriate test for determining the voluntariness of a confession as "'whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.' United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989)," 918 F.2d at 1379. In Meirovitz, the Court continued that two factors must be considered in determining whether a suspect's will was overborne and those factors are "'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.' Id. (citing Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515 (1986))."

The court finds the actions of the officers were entirely appropriate. The defendant's rights under the Fourth and Fifth Amendments were in no way violated by their actions and when he decided he wanted to speak with an attorney on March 12, 2007, the interview ceased.

There is no evidence that the defendant's will was overborne. On March 11 and 12, 2007, Adam O'Leary was 25 years old. He graduated from high school in Branson, Missouri. He attended college in Ottawa, Kansas, for one year and Ozark Technical College in Springfield, Missouri, for one year. The detention order relates that the defendant was arrested on a number of occasions. On January 15, 2000, he was arrested in Taney County, Missouri, for Distribution, Delivery, Manufacturing a Controlled Substance and Possession of a Controlled Substance. On May 3, 2001, he pled guilty and was sentenced to three years in the Missouri Department of Corrections. He had been arrested for Driving While Intoxicated on April 16, 2001. He was arrested in September of 2001 for Driving With No

Driver's License and again in January of 2004 for Driving Without a Driver's License. He was convicted in 2005 for Driving While Suspended. At that time, he was on bench probation on charges of Domestic Assault-3d Degree and a violation of an Order of Protection. The defendant incurred more traffic violations in 2005for other traffic offenses as well as Resisting/Interfering With an Arrest. In February of 2007, following arrests, he was to appear in court but failed to appear and a warrant was issued for his arrest. Since the beginning of 2007, the defendant was arrested four times, including the arrest on March 11, 2007. The defendant has extensive experience with the law.

The defendant made his own decision not to speak further with officers on March 12, 2007. The defendant's age, his background and education and his history of contacts with the law all indicate that the defendant understood his rights, was able to resist pressure to confess and voluntarily waived his right to remain silent.

The excerpts quoted by Mears from Zamarripa and that from Meirovitz apply to the statements made by the defendant on the early morning of March 11, 2007, and those made on March 12, 2007, until he requested an attorney. As noted, the validity of a waiver is to be determined from all the surrounding circumstances. The court has extensively reviewed the events of the morning of March 11 and those of March 12, 2007, and has found that the defendant did not clearly and unequivocally invoke his right to remain silent. The defendant's statements were not the result of undue coercion. The defendant's will was not overborne. The defendant's statements were voluntary.

The court finds from all the surrounding circumstances the defendant, by voluntarily making the statements he did to officers in the early morning of March 11 and on March 12,

2007, after having been given Miranda warnings, having understood those warnings and having agreed to speak with officers, voluntarily waived his right to remain silent. The court finds that the statements made by the defendant on those occasions were made with understanding, were voluntary and are admissible.

**IT IS, THEREFORE, RECOMMENDED** that the defendant's Motion to Suppress Evidence and Statements (Document #20) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

_____
LEWIS M. BLANTON
United States Magistrate Judge

Dated: July 20, 2007.